STATE of Wisconsin, Plaintiff-Respondent,

v.

Jesse H. SWINSON, Defendant-Appellant.†

Court of Appeals

*Nos. 02–0395–CR, 02–0396–CR. Submitted on briefs December 12, 2002.—Decided February 26, 2003.*

2003 WI App 45

(Also reported in 660 N.W.2d 12.)

† Petition to review denied 7-9-03.

635

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Pamela Pepper*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *William C. Wolford*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Brown, Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Jesse H. Swinson appeals from a trial court judgment convicting him of fifteen counts of theft by fraudulent misrepresentation contrary to WIS. STAT. § 943.20(1)(d) (1999–2000).[1] He argues that the evidence presented at trial did not support the venue chosen; that the information charging him was multiplicitous; that his rights under the

---

[1] WISCONSIN STAT. § 943.20(1)(d) (1999–2000) provides that whoever does the following may be penalized under the statute:

> Obtains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

Equal Protection Clause have been violated as a result of the fact that, unlike defendants charged with drug crimes, he had no protection against being prosecuted in both federal and state court for the same acts; and that his trial counsel was ineffective in failing to raise the above issues. Because we disagree with all of Swinson's arguments, we affirm.

## Procedural History

¶ 2. On June 9, 1994, the State filed an information charging Swinson with fifteen counts of theft by fraudulent misrepresentation. Swinson moved for dismissal, claiming double jeopardy because he had already been prosecuted in federal court for the same acts alleged in the State's information.[2] On November 16, 1994, the court denied Swinson's motion.

¶ 3. On Februrary 17, 1995, after a jury trial, Swinson was found guilty of fifteen counts of theft by fraudulent misrepresentation. Swinson did not appear at the May 3, 1995 sentencing. On May 17, 1995, the State filed a complaint charging Swinson with bail jumping and a criminal warrant for his arrest was issued. Four years later, on May 17, 1999, Swinson appeared in Sheboygan County Circuit Court where he

---

[2] In 1991, a federal grand jury indicted Swinson on seventeen counts of mail fraud. In 1993, a jury convicted Swinson of mail fraud in violation of 18 U.S.C. § 1341 concerning a scheme whereby Swinson had defrauded the Kohler Company of nearly $300,000. *United States v. Swinson*, 993 F.2d 1299, 1300 (1993).

The case was appealed and the Seventh Circuit Court of Appeals concluded that the prosecution failed to produce sufficient evidence of a mailing. *Id.* at 1303–04. The court reversed and remanded with instructions for the district court to enter a judgment of acquittal. *Id.*

was advised of the bail-jumping charge and ordered held without bond on the original theft-by-fraud convictions.

¶ 4. On August 6, 1999, Swinson pled guilty to the bail-jumping charge and was sentenced to a combined total of twenty-nine years in prison for the theft convictions and the bail-jumping conviction.

¶ 5. On August 23, 1999, Swinson filed a Notice of Intent to Pursue Postconviction Relief. On November 20, 2001,[3] he filed an amended motion for a new trial and requested a *Machner*[4] hearing. After an initial hearing on November 29, 2001, the trial court denied Swinson's arguments of insufficient proof of venue and ineffective assistance of counsel. Shortly thereafter, the court also denied Swinson's arguments on multiplicity and equal protection. Swinson appeals on the same four grounds advanced in his motion for a new trial.

## Facts

¶ 6. The evidence adduced at trial is as follows. In 1986 or 1987, Kohler Company hired Swinson as an electrical engineer. Prior to that, Swinson had worked for Kohler on a contractual basis. At some point after being hired as an employee at Kohler, Swinson became heavily involved in the Mill Building Renovation project and eventually became the project manager. Project managers were allowed to contract with outside vendors for goods and services. By the time the Mill

---

[3] Swinson's brief explains that the time lag between his Notice of Intent to Pursue Postconviction Relief and his post-trial motions occurred because of difficulties he had with obtaining counsel.

[4] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

Building Renovation project was completed, the cost exceeded the original expectations.

¶ 7. In 1989, Kohler conducted an internal audit, with a partial purpose of determining whether any vendors had sold anything to Kohler that could not be accounted for. As part of this audit, internal audit manager Kevin Kelley obtained documents concerning Dynamic Control Engineering. Dynamic Control Engineering invoices and purchase orders were addressed to the Kohler Company in Kohler, Wisconsin, located in Sheboygan county. Kelley matched up requisitions, purchase orders, invoices, cancelled checks and other relevant documents for a variety of transactions between Kohler and Dynamic Control Engineering.

¶ 8. Kelley testified that Kohler only cut checks and made payments for work performed *after* the vendor had provided an invoice *and there was verification* that the work had been performed. He further testified that it would not be unusual for Swinson as the project manager to issue requisitions for purchase and to list his preferred vendor. He said that if there was not an actual "receiving document" to verify work was performed, an invoice initialed by the project manager was a "quite common" form of verification. Kelley testified to occasions where Swinson's initials on an invoice were the only indication that work was performed.

¶ 9. The billing address on the purchase orders from Dynamic Control Engineering was "KOHLER CO. ACCOUNTS PAYABLE DEPT. KOHLER WI 53044." Kohler paid Dynamic Control Engineering for the work specified on the invoices by checks written from a Sheboygan bank account.

¶ 10. Bank records from Valley Bank of Fredonia indicated that Swinson was a signatory on the Dynamic Control Engineering account, and a representative of

the bank testified that she had dealt with Swinson in opening the account. FBI analyses of the account records indicated that $264,824.42 in Kohler checks had been deposited into the Dynamic Control Engineering account. The business address for Dynamic Control Engineering at the time was a Mail Plus store. A standard contract rental agreement for a box at the Mail Plus store bore the name and signature of Jesse Swinson for Dynamic Control Engineering.

¶ 11. Kelley next sought to determine whether the goods or services that Dynamic Control Engineering had sold to Kohler were actually on Kohler premises; he gave the task to one of Kohler's engineering management personnel, Charles Edward Farrell. In fifteen instances—those charged in the information—Farrell was unable to find the particular parts and/or services for which Kohler had paid Dynamic Control Engineering.[5] Based on Farrell's findings, Kelley concluded that Dynamic Control Engineering was the only company that sold items to Kohler that could not later be found.

¶ 12. Kelley testified that he had reviewed "gate logs" to see if he could find any documentation proving deliveries of items from Dynamic Control Engineering to Kohler; he could find no such documents. Kelley further testified that he searched for any record of competitive bidding on the Dynamic Control Engineering purchases and could not find any documentation indicating that such bidding had taken place.

¶ 13. In the fall of 1989, Kelley participated in a meeting involving Swinson and his attorney. According

---

[5] Tom Hodgert, who was appointed electrical manager after Swinson left Kohler, also conducted an audit under the new project manager, Tony Bartel. His findings were similar to those of Farrell. Bartel gave similar testimony at trial.

to Kelley, the purpose of the meeting was "to allow Mr. Swinson the opportunity to come in and identify any of the products or services that were invoiced by Dynamic Control Engineering." Kelley testified that at the meeting "either Mr. Swinson or his attorney indicated that there was no purpose in going into the plant to find [the products or verify the services in question]." Kelley testified that Swinson and his attorney indicated that it was their belief that the items "were already moved or that something would have been done in order to disguise what might have been performed."

¶ 14. James Vasatka, who preceded Swinson as project manager for the Mill Building Renovation project, testified that there were cost overruns incurred by problems that were encountered along the way, such as processing problems with one of the smelters. John Schiro, the attorney who had represented Swinson in the fall 1989 meeting, testified that during this meeting, Swinson offered to go and physically find the items that Dynamic Control Engineering had sold to Kohler, but that Kohler representatives did not want Swinson to do so.

¶ 15. Swinson testified in his own defense. He stated that in his capacity as project manager at Kohler, he had requisitioned the work on the products or services at issue, and he—through his company, Dynamic Control Engineering—had either actually done the work listed on the invoices or had provided the products necessary to do the work. Swinson testified that the reason Farrell and others would not have been able to find these items during their inventory of the Kohler facility was because some of the items were "cannibalized"—that is, taken to be used on other projects in different areas. He claimed that other items were delivered but were not installed due to changes in

or problems with the project. He said that storage for items of this size was a problem at Kohler and therefore items moved from floor to floor during the day.

¶ 16. Additionally, Swinson said that sometimes design specifications required an item to be rebuilt altogether. He claimed that with certain wiring projects it would be difficult for someone else to tell if any prior work had been done. He stated that during the fall 1989 meeting he asked to schedule a time to "help explain any of the items or what we did with them or how we used them or locate them, if possible." He said that Kohler never scheduled a time for him to do this.

¶ 17. Finally, Swinson admitted that contrary to the bank documents, mailbox rental documents and other Dynamic Control Engineering records, there were no employees working at the company other than he. He admitted that the names used on these documents "came from a group of resumes that I had solicited."

¶ 18. **Venue.** We address each of Swinson's arguments in order. Swinson contends that the State failed to produce sufficient evidence to show that any of the elements of the offense occurred in Sheboygan county. The State responds that Swinson has waived his ability to challenge venue; however, it does respond to the merits of this challenge. We do reach the merits of Swinson's venue challenge because he also raises an ineffective assistance of counsel challenge, which in part claims that his counsel should have challenged venue.

■

¶ 19. This court will not reverse a conviction based on the failure of the State to establish venue unless the evidence, viewed most favorably to the State and the conviction, is so insufficient that there is no

basis upon which a trier of fact could determine venue beyond a reasonable doubt. *State v. Corey J.G.*, 215 Wis. 2d 395, 407–08, 572 N.W.2d 845 (1998). First, we note that although venue in Wisconsin must be proved beyond a reasonable doubt, it is not an element of the crime, but rather a matter of procedure, which refers to the place of trial. *State v. Dombrowski*, 44 Wis. 2d 486, 501–02, 171 N.W.2d 349 (1969). Second, venue may be established by proof of facts and circumstances from which it may be reasonably inferred. *See Smazal v. State*, 31 Wis. 2d 360, 363–64, 142 N.W.2d 808 (1966).

¶ 20. We agree with the trial court that the State produced sufficient evidence to establish venue in Sheboygan county. Wisconsin Stat. § 971.19(2) provides: "Where 2 or more acts are requisite to the commission of any offense, the trial may be in any county in which *any* of such acts occurred." (Emphasis added.) The requisite elements to establish theft by fraud are:

> First, that the defendant made a false representation to (name owner of property).

> Second, that the defendant knew that such representation was false.

> Third, that the defendant made such representation with intent to deceive and to defraud (name owner of property).

> Fourth, that the defendant obtained title to the property of (name owner of property) by such false representation.

> Fifth, that (name owner of property) was deceived by such representation.

646

Sixth, that (name owner of property) was defrauded by such representation.

Wɪs JI—Cʀɪᴍɪɴᴀʟ 1453.

¶ 21. Thus, the offense of theft by fraud requires "2 or more acts" and if *any* element occurs in Sheboygan county, then that county can be the place of trial. We agree with the State that the evidence supports that at least one of the elements occurred in Sheboygan county, and therefore venue in that county is proper.

¶ 22. First, the record shows that the invoices were addressed to the Kohler Company at the Sheboygan county address and this is sufficient circumstantial evidence to establish that the invoices were *received* in Sheboygan county. *See Smazal*, 31 Wis. 2d at 363–64. The record establishes that an element occurred in Sheboygan county because it establishes that Kohler was deceived by Swinson's false representation in Sheboygan county.

¶ 23. Second, the record shows that purchase orders were "billed to" Kohler's accounts payable department at the Sheboygan county address. This is sufficient circumstantial evidence that the relevant checks were cut from the accounts payable department located at the Sheboygan county address. Swinson makes a point of arguing that the bank location from which each check was drawn was not proved by the State; the bank location can be significant to prove venue but is not controlling because also significant is the location where the check is "cut." Once a check is "cut" or signed in Sheboygan county, Kohler has parted with money. That is, it has been defrauded by acting on the false representation in Sheboygan county. This also establishes the occurrence of an element in Sheboygan county.

¶ 24. Swinson makes much of the fact that the State put forth no evidence that the invoices were prepared in Sheboygan county. Swinson admitted that he prepared the invoices—the location where the invoices were prepared is not controlling. It is the act of making the false statement and not the manner in which it is made that is important. *Cf. State v. Timblin*, 2002 WI App 304, ¶ 30, 259 Wis. 2d 299, 657 N.W.2d 89 (in *Timblin*, we affirmed a conviction for theft by fraud where all the false statements were passed through a conduit to the victims). We are satisfied that the evidence sufficiently establishes that Kohler was deceived and defrauded in Sheboygan county. The State sufficiently proved venue in Sheboygan county.

¶ 25. Swinson also contends that the trial court erred in failing to instruct the jury on venue. Swinson concedes that the trial court did not do so because he did not request such an instruction. Nevertheless, Swinson contends that the trial court erroneously exercised its discretion in failing to instruct on venue because the State failed to meet its burden of proving venue beyond a reasonable doubt. He also contends that because there was no instruction on venue, he should receive a new trial because the real controversy was not tried. We disagree.

¶ 26. A specific instruction on venue needs to be given only when venue is contested. WIS JI—CRIMINAL 267 n.1. Swinson did not request a specific instruction on venue; therefore, the trial court did not erroneously exercise its discretion in failing to give such an instruction. The real issue in controversy was fully tried; therefore, this case is not appropriate for discretionary

reversal. *See* Wis. Stat. § 752.35. As already discussed, the State proved venue in Sheboygan county.

¶ 27. **Multiplicity.** Swinson argues that the fifteen counts of theft by fraud were multiplicitous and therefore his conviction on each of these counts violates his double jeopardy rights. The State, as it did with Swinson's venue challenge, responds that Swinson has waived his ability to challenge multiplicity; however, it does respond to the merits as well. Like our decision to reach the merits of Swinson's venue challenge, we will reach the merits of his multiplicity challenge because his ineffective assistance of counsel challenge in part claims that his counsel should have challenged multiplicity.

■

¶ 28. The double jeopardy clauses of our federal and state constitutions protect against multiple punishments for the same offense. *State v. Derango*, 2000 WI 89, ¶ 26, 236 Wis. 2d 721, 613 N.W.2d 833. In *Derango*, the supreme court recently reiterated the standards that guide this court's review of multiplicity challenges:

> Multiplicity (and therefore double jeopardy) is implicated only to the extent of preventing a court from imposing a greater penalty than the legislature intended. In other words, because double jeopardy protection prohibits double punishment for the "same offense," the focus of the inquiry is whether the "same offense" is actually being punished twice, or whether the legislature indeed intended to establish separate offenses subjecting an offender to separate, although cumulative, punishments for the same act . . . .
>
> We have established a two-part test for analyzing multiplicity challenges. The first part consists of an analysis under *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to determine whether the offenses are

identical in law and fact . . . . The second part, which we reach if the offenses are not identical in law and fact, is an inquiry into legislative intent.

The *Blockburger* test requires us to consider whether each of the offenses in this case requires proof of an element or fact that the other does not. If, under this test, the offenses are identical in law and fact, then charging both is multiplicitous and therefore unconstitutional. *If under the Blockburger test the offenses are different in law or fact, a presumption arises that the legislature intended to permit cumulative punishments for both offenses. This presumption can only be rebutted by clear legislative intent to the contrary.*

*Derango*, 2000 WI 89 at ¶¶ 28–30 (citations omitted; emphasis added).

■■■■■

¶ 29. It is only the first part of the multiplicity test that involves the constitutional double jeopardy provisions. *State v. Trawitzki*, 2001 WI 77, ¶ 22, 244 Wis. 2d 523, 628 N.W.2d 801. If the charged offenses are not identical in law and fact, then we are no longer concerned with a double jeopardy violation. *Id.* The second part of this test is not a constitutional inquiry, but rather a question of statutory interpretation. *Id.* The second part of the test focuses on the legislative intent as to the allowable unit of prosecution under the statute in question. *Id.*

¶ 30. We apply the first part of the multiplicity test and conclude that the charges against Swinson are not identical in law and fact. Both parties concede that the charges are identical in law because they arise under the same criminal statute, WIS. STAT. § 943.20(1)(d). *See State v. Anderson*, 219 Wis. 2d 739, 747, 580 N.W.2d 329 (1998).

¶ 31. However, the charges against Swinson are not identical in fact, and the parties concede this as well. The test for whether charges are not identical in fact is whether "the facts are either separated in time or of a significantly different nature." *Id.* at 749. To be of a significantly different nature, each charged offense must require proof of an additional fact that the other charges do not. *Id.* at 750. In this case, each theft charge against Swinson requires proof of an additional fact that the other charges do not, namely, the proof of the existence of each individual invoice. Because each charge alleges that Swinson falsely represented that a product or service was provided, the State must prove the existence of the specific invoice on which Swinson made this false representation, that the invoice deceived the receiver, Kohler, and that Kohler by acting upon it was defrauded by Swinson's false representation.

¶ 32. Furthermore, the charges are different in fact because they are separated by time and involve separate volitional acts. *State v. Davis*, 171 Wis. 2d 711, 717, 492 N.W.2d 174 (Ct. App. 1992). Separate volitional acts occur when the offender has sufficient time between acts to reflect on his or her actions and to recommit to the criminal conduct. *Id.* at 717–18. Here, separate volitional acts occurred because Swinson had sufficient time between preparing each separate invoice to reflect on his actions and to recommit to the criminal conduct. *See id.*

¶ 33. Having determined that the charges against Swinson are not identical in law and fact, we apply the second part of the multiplicity test: whether the legis-

lature intended multiple offenses to be brought as a single count. *Anderson*, 219 Wis. 2d at 746. Because the charges against Swinson are not identical in fact, we presume that the legislature intended separate charges for his actions. *See id.* at 751. Swinson may rebut this presumption only by a clear indication of legislative intent to the contrary. *See id.* We consider four factors in discerning legislative intent for a multiplicity challenge: "1) statutory language; 2) legislative history and context; 3) the nature of the proscribed conduct; and 4) the appropriateness of multiple punishment." *Id.* at 751–52.

■■■■

¶ 34. We apply this. four-factor examination and conclude that Swinson has not overcome the presumption that the legislature intended separate charges for his separate acts of preparing fifteen fraudulent invoices at fifteen different times causing Kohler to be misled and to part with its money on fifteen distinct occasions.

¶ 35. First, the statutory language of WIS. STAT. § 943.20(1) states that one who makes a false representation under that subsection may be penalized as provided in subsec. (3). Paragraph (3)(c) states that if the value of the property exceeds $2500, the violator is guilty of a Class C felony. In this case, each of the fifteen counts involved the theft of money in excess of $2500. The State's theory of the case was that *each* invoice submitted to Kohler by Swinson's company, Dynamic Control Engineering, was a separate false representation that work had been done for Kohler by that firm for which the firm was entitled to be paid. Swinson argues that under the State's theory of the case, there was only one false representation—that Dynamic Control Engineering was an entity other than Jesse Swinson. How-

ever, this is not an accurate description of the State's theory and Swinson does not succeed in advancing it as such. The statutory language does not indicate that the legislature intended these fifteen counts to be charged as one.

¶ 36. The second factor we consider in discerning legislative intent is the legislative history. Swinson informs us in his brief that "counsel was unable to track down the legislative history of section [WIS. STAT. §] 943.20(1)(d)." It is Swinson's burden to rebut the presumption that the legislature intended his actions to be charged separately. His inability to "track down" the legislative history of the statute fails as a sufficient rebuttal to overcome the presumption.

¶ 37. Under this second factor, we also examine the context of the statute. *Trawitzki,* 2001 WI 77 at ¶ 33. Swinson relies on *Trawitzki* to show that the context of the relevant statute rebuts the presumption that the legislature intended his acts to be charged separately. Swinson's reliance on *Trawitzki* to meet his burden of rebuttal is again unsuccessful. *Trawitzki* is factually distinguishable from the case at bar and, furthermore, rather than help Swinson, its reasoning supports the State's position.

¶ 38. In *Trawitzki,* members of a criminal gang burglarized a residence. *Id.* at ¶ 4. Members of the gang took ten firearms from various rooms and wrapped them all in a sheet in order to carry the firearms out of the home. *Id.* The firearms were then placed in the trunk of a gang member's car and taken to another's residence, where they were stored in the basement. *Id.* The next morning, several of the gang members took five of the stolen firearms and hid them near a bridge. *Id.* Subsequently, members of this gang, including Trawitzki, traveled to Minnesota where they

were taken into custody near Duluth. *Id.* Some of the firearms were found in their possession. *Id.*

¶ 39. The State charged Trawitzki with one count of armed burglary as a party to a crime and in association with a criminal gang, in violation of WIS. STAT. §§ 943.10(1)(f), 943.10(2)(b), 939.05, and 939.625(1)(a) (1997–98). *Trawitzki,* 2001 WI 77 at ¶ 5. The State also charged Trawitzki with ten counts of theft for taking and carrying away a firearm as a party to a crime and in association with a criminal gang, in violation of WIS. STAT. §§ 943.20(1)(a), 943.20(3)(d)5, 939.05, and 939.625(1)(a) (1997–98). *Trawitzki,* 2001 WI 77 at ¶ 5. Lastly, the State charged Trawitzki with five counts of concealing stolen property as a party to a crime and in association with a criminal gang, in violation of §§ 943.20(1)(a), 943.20(3)(d)5, 939.05, and 939.625(1)(a) (1997–98). *Trawitzki,* 2001 WI 77 at ¶ 5.

¶ 40. Trawitzki pled not guilty to all charges. *Id.* at ¶ 6. After a jury found Trawitzki guilty of all charges, he filed a postconviction motion claiming that the charges were multiplicitous and therefore in violation of the constitutional prohibition against double jeopardy. *Id.* at ¶¶ 1, 10.

¶ 41. In *Trawitzki,* the supreme court referred to context as the "part of a text or statement that surrounds a particular word or passage and determines its meaning." *Id.* at ¶ 33 (citation omitted). The *Trawitzki* court directed that in examining context, we look at the structure of the penalty section of the statute that surrounds the specific penalty provision regarding the type of theft at issue. *See id.* In the penalty section of the statute, there are three classifications for the taking or concealing of property. WIS. STAT. § 943.20(3). For punishment purposes, these classifications are treated differently. The first classification relates to general

property, which is punished according to the value of the property. Sec. 943.20(3)(a)-(c); *Trawitzki*, 2001 WI 77 at ¶ 33. The second classification relates to property under certain circumstances, such as property taken after a physical disaster, punished as a Class D felony. Sec. 943.20(3)(d); *Trawitzki*, 2001 WI 77 at ¶ 33. The third classification relates to certain kinds of property, such as a firearm or a domestic animal, punished as a Class D felony. Sec. 943.20(3)(d); *Trawitzki*, 2001 WI 77 at ¶ 33.

¶ 42. The *Trawitzki* court concluded: "Since the legislature separated the taking or concealing of a firearm from the taking or concealing of other kinds of property, it follows that the legislature intended separate charges for each firearm involved." *Trawitzki*, 2001 WI 77 at ¶ 33. It further stated:

> The fact that the penalty section of the statute divides property into three classifications leads . . . us to reject Trawitzki's argument that absurd results will follow from our decision. According to Trawitzki, the decision to allow multiple charges will lead to arbitrary and absurd results, such as charging a person with two counts of theft for stealing one pair of shoes. This comparison is inappropriate because shoes and firearms are treated differently by the statute. A pair of shoes falls under the first classification, punished according to the value of the property. A firearm falls under the third classification, punished as a Class D felony regardless of the firearm's value. Therefore, a defendant accused of stealing one pair of shoes will be charged according to the value, not the number, of the shoes.

*Id.* at ¶ 34 (footnote omitted).

¶ 43. Swinson claims that the above reasoning in *Trawitzki* is "helpful" because it supports the proposition that "in a case of theft of general property—that is,

property that is not a firearm or domestic animal [e.g. a pair of shoes, five compact discs]—a defendant may not be charged multiple times for the number of items he takes." We disagree with Swinson's interpretation.

¶ 44. First, Swinson ignores the fact that the court's above reasoning referred to the hypothetical theft of a pair of shoes *taken in one episode of theft* and the hypothetical theft of five compact discs *taken in one episode of theft*. His case concerns the theft of fifteen separate amounts of money *taken in fifteen distinct episodes of theft*. Second, Swinson's interpretation of *Trawitzki* improperly redefines the second part of the multiplicity test, which states that when the multiple charges against a defendant are not identical in law and fact, we must presume that the legislature intended separate charges for his or her actions. *See Anderson*, 219 Wis. 2d at 746, 751. Swinson's interpretation is tantamount to the claim that the presumption that the legislature intended separate charges for actions not identical in law and fact exists only in the case of firearm or domestic animal thefts. We cannot agree. Swinson has not convinced us that the legislature or the *Trawitzki* court intended to narrow the applicability of this presumption. Swinson fails to show by a clear indication of legislative intent to the contrary that in the context of the legislative history, his acts are not meant to be charged separately.

¶ 45. The third factor we examine to determine legislative intent in a multiplicity analysis is the nature of the proscribed conduct. Swinson contrasts his case with *Trawitzki*, 2001 WI 77 at ¶ 35, in which the court stated that each stolen firearm increased the threat to society. Swinson seems to conclude that the court meant to imply that without a showing of an increased danger to society, multiple charges for multiple acts

656

such as his cannot be considered separately. His conclusion is misguided. Moreover, Swinson ignores that the *Trawitzki* court was faced with explaining why multiple charges for one episode involving the theft of multiple firearms was not multiplicitous. Swinson's case is distinguishable because each act of preparing each fraudulent invoice occurred at a different time and each fraudulent invoice required a separate volitional act. Swinson has not succeeded in rebutting the presumption that the nature of his conduct is a type meant to be charged separately.

¶ 46. The fourth factor we examine to determine legislative intent in a multiplicity analysis is the appropriateness of multiple punishments. Swinson contends that multiple punishments were not appropriate because he faced a maximum penalty of 150 years' imprisonment. We again disagree. If Swinson were charged with only one count, there would be no deterrent to continued criminal activity. *See State v. Grayson*, 172 Wis. 2d 156, 166, 493 N.W.2d 23 (1992). Moreover, multiple punishments would provide proportionality between the harm caused and the punishment received. *See id.* at 166–67. The total money obtained from Kohler by Swinson was approximately $250,000. Swinson has not convinced us that he should not be subject to a greater penalty than one who obtains $2501 from a fraud victim.

¶ 47. Swinson has failed to show a clear indication of legislative intent that there be no multiple charges or multiple punishments for his actions under Wis. Stat. § 943.20(1)(d). The charges are not multiplicitous.

¶ 48. **Equal Protection.** Swinson claims that his equal protection rights were violated when he was prosecuted by the State after being prosecuted federally for the same acts. In particular, Swinson contends that:

[The] application of WIS. STAT. § 939.71, after the Supreme Court's decision in [*State v. Hansen*, 2001 WI 53, 243 Wis. 2d 328, 627 N.W.2d 195], denies him equal protection of the law, in violation of the Equal Protection Clause of the Fourteenth Amendment. Specifically, Swinson argues that after [*Hansen*], defendants who have been prosecuted in another jurisdiction for controlled substances offenses are protected from subsequent prosecution in Wisconsin under WIS. STAT. § 961.45, while defendants who are charged with non-drug offenses do not have that protection, and may be charged with violations of Wisconsin law even after they have been convicted or acquitted for the same act in another jurisdiction.

¶ 49. We first discuss the statutes referenced in Swinson's equal protection argument—WIS. STAT. §§ 939.71 and 961.45. Section 939.71 provides:

If an act forms the basis for a crime punishable under more than one statutory provision of this state or under a statutory provision of this state and the laws of another jurisdiction, a conviction or acquittal on the merits under one provision bars a subsequent prosecution under the other provision unless each provision requires proof of a fact for conviction which the other does not require.

Under this statute, a subsequent prosecution is not prohibited if each provision requires proof of a fact for conviction which the other does not require, even if the same conduct was involved in the two prosecutions. In contrast, § 961.45 provides:

If a violation of this chapter is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state.

The supreme court interpreted § 961.45 in *Hansen*.

There, the court held that a person covered by § 961.45 could not be prosecuted in state court for a drug offense after a federal prosecution for the same act even if the provisions under which the two jurisdictions prosecuted the person were not the same. *Hansen*, 2001 WI 53 at ¶¶ 1, 4.

¶ 50. Based on *Hansen*, Swinson concludes "there is no rational basis to support the disparate impact of section 939.71 in contrast to section 961.45." He argues that drug offenders should not enjoy greater protection from multiple prosecutions than non-drug offenders.

¶ 51. The State counters that the equal protection issue was not raised before or at trial and is waived; the State also responds to the merits. We choose to reach the merits. On the merits, the State argues that the "legislature reasonably could have chosen to provide more protection for drug defendants from dual prosecution than for other defendants because it recognized that federal authorities are more likely to be involved in drug prosecutions than in prosecutions relating to other state crimes." The State concludes that there are plausible explanations for the classification made by the two statutes, that therefore a rational basis exists for the classification and that Swinson has failed to prove the unconstitutionality of the classification.

¶ 52. We agree with the State that Swinson has failed to prove the unconstitutionality of the application of WIS. STAT. § 939.71. However, we provide additional explanation. In reaching our conclusion, we are guided by the supreme court's analysis regarding WIS. STAT. § 161.45 (1991–92)[6] in *State v. Petty*, 201 Wis. 2d 337,

[6] The language of WIS. STAT. § 161.45 (1991–92) is identical to the language in WIS. STAT. § 961.45 (1999–2000):

357–60, 548 N.W.2d 817 (1996). In *Petty*, the issue was whether Petty's plea to a federal charge of conspiracy to distribute cocaine required that his earlier state conviction for possession of cocaine with intent to deliver be vacated under the terms of § 161.45 (1991–92). *Petty*, 201 Wis. 2d at 342–43.

¶ 53. In its analysis, the *Petty* court observed that "the language of the statutory bar to prosecution within the Controlled Substances Act clearly indicates the legislature's intent to abolish the dual sovereignty doctrine by statute, with regard to substantially identical drug offenses based on the same act." *Id.* at 357–58. However, the court also noted "[t]he United States Supreme Court and courts of numerous states have held that a state prosecution following a federal prosecution *does not* constitute a violation of the defendant's constitutional protection against being placed in double jeopardy." *Id.* at 358 (emphasis added). In *Abbate v. United States*, 359 U.S. 187, 194 (1959), the United States Supreme Court discussed the doctrine of dual sovereignty, observing:

> "We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory . . . . Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other."

> "It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each. The Fifth Amendment, like all the other guaran-

---

If a violation of this chapter is a violation of a federal law or the law of another state, a conviction or acquittal under federal law or the law of another state for the same act is a bar to prosecution in this state.

ties in the first eight amendments, applies only to proceedings by the Federal Government . . . and the double jeopardy therein forbidden is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority." (Citation omitted.)

¶ 54. The *Petty* court acknowledged that despite this directive regarding the doctrine of dual sovereignty, a number of states, focusing upon the individual's interest in being free from repeated prosecutions for the same alleged acts, have enacted legislation aimed at alleviating continued prosecution, depending upon the similarity of the state and federal charges and upon whether the state and federal laws were designed to protect the same governmental interests. *Petty*, 201 Wis. 2d at 358–59. The court then concluded that WIS. STAT. § 161.45 (1991–92) "is representative of the type of legislation instituted by those jurisdictions precluding continuing prosecution, as permitted under the doctrine of dual sovereignty." *Petty*, 201 Wis. 2d at 359.

¶ 55. We note that while WIS. STAT. § 939.71 adheres to the dual sovereignty doctrine, WIS. STAT. § 961.45 does not. We therefore conclude, as the supreme court did in *Petty*, that § 961.45 is representative of the type of legislation instituted by our legislature seeking to preclude continuing prosecution in the drug arena as is otherwise *permitted* under the doctrine of dual sovereignty. *See Petty*, 201 Wis. 2d at 358–59. That is, in deciding not to abrogate the dual sovereignty doctrine in nondrug cases, the legislature could have rationally considered that in the nondrug arena the interests of the state and federal governments are different. Swinson has not persuaded us of the unconstitutionality of § 939.71 as applied to him.

661

¶ 56. **Ineffective Assistance.** Swinson's last claim is that his trial counsel's performance was ineffective because he failed to raise the issue of insufficiency of the evidence regarding venue and the issue of multiplicity. Accordingly, he argues that his conviction must be reversed. We do not agree.

¶ 57. We review the circuit court's findings of fact regarding counsel's conduct under a clearly erroneous standard. *State v. Pitsch*, 124 Wis. 2d 628, 633–34, 369 N.W.2d 711 (1985). Whether those facts constitute deficient performance and prejudice are questions of law that we review independently. *State v. Tulley*, 2001 WI App 236, ¶ 5, 248 Wis. 2d 505, 635 N.W.2d 807, *review denied*, 2002 WI 2, 249 Wis. 2d 581, 638 N.W.2d 591 (Wis. Dec. 17, 2001) (No. 00–3085–CR).

¶ 58. The test for ineffective assistance of counsel has two prongs: (1) a demonstration that counsel's performance was deficient, and (2) a demonstration that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). To satisfy the prejudice prong, the defendant must show that counsel's errors were serious enough to render the resulting conviction unreliable. *Strickland*, 466 U.S. at 687. We need not address both components of the test if the defendant fails to make a sufficient showing on one of them. *Id.* at 697.

¶ 59. We easily dispose of Swinson's ineffective assistance of counsel argument. It is apparent from our earlier discussion of venue and multiplicity that a motion raising either of these issues would have been unsuccessful. Thus, Swinson has not shown that the resulting conviction on either of these issues is unreliable. *See id.* at 687. Our discussion is therefore complete—Swinson fails to make a sufficient showing on one prong of the test for ineffective assistance of counsel, so we need not address the other prong. *See id.* at 697. Trial counsel's failure to bring a meritless motion does not constitute deficient performance. *State v. Wheat,* 2002 WI App 153, ¶ 14, 256 Wis. 2d 270, 647 N.W.2d 441, *review denied,* 2002 WI 111, 256 Wis. 2d 65, 650 N.W.2d 841 (Wis. July 26, 2002) (No. 01–2224–CR).

¶ 60. Swinson was properly convicted of fifteen counts of theft by fraudulent misrepresentation contrary to Wis. Stat. § 943.20(1)(d). We hold that the evidence presented at trial supports the venue chosen and that the information charging Swinson was not multiplicitous. We further hold that Swinson's rights under the Equal Protection Clause have not been violated as a result of the fact that, unlike defendants charged with drug crimes, he did not have protection against being prosecuted in both federal and state court for the same acts. Finally, we do not deem his trial counsel ineffective in failing to raise the above issues.

*By the Court.*—Judgment and order affirmed.