STATE of Wisconsin, Plaintiff-Respondent,

v.

David M. CARLSON, Defendant-Appellant.†

Court of Appeals

*No. 2013AP2559–CR. Submitted on briefs September 9, 2014.
—Decided November 12, 2014.*

2014 WI App 124

(Also reported in 857 N.W.2d 446.)

† Petition for review filed.

123

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Gregory W. Wiercioch* of the *Frank J. Remington Center*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Warren D. Weinstein*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Reilly and Gundrum, JJ.

¶ 1. BROWN, C.J.   David M. Carlson received a twenty-three year bifurcated sentence after he pled guilty to multiple sexual assaults of a child under the age of sixteen. He seeks to withdraw his guilty plea on grounds of ineffective assistance of counsel, arguing that his trial counsel was ineffective because he told Carlson that pleading guilty would give him a "realistic possibility" of a nonprison sentence. Carlson claims based on sentencing data that a nonprison sentence was a practical impossibility. Carlson also challenges his sentence on three different grounds:   (1) that it was based on inaccurate information regarding the precise number of times that he assaulted the victim, (2) that his lawyer should have objected to this inaccuracy, and (3) that his sentence was unduly harsh.

¶ 2.   Because the trial court failed to hold an evidentiary hearing on Carlson's ineffective assistance of counsel claims, we are forced to accept Carlson's account of his lawyer's advice. Even accepting all of Carlson's allegations at face value, however, nothing he alleges constitutes deficient performance. A nonprison sentence was within the realm of possibility, and his trial counsel's advice to plead guilty was sound under the circumstances. The strategy was undermined not by the court's calculation of the number of assaults, but by the fact that during the presentencing investigation, Carlson blamed the victim for the offenses and "expressed zero empathy." Withholding objection to the

judge's calculation of the number of assaults was a wise strategy at sentencing. Credible evidence in the record supported the court's calculation, and the calculation was of little relevance. We affirm.

*Facts*

¶ 3.   In March 2012, Carlson pled guilty to two child sexual assault charges against the same victim: one charge of repeated sexual assault of the same child in Washington county, and one charge of second-degree sexual assault of a child under age sixteen in Ozaukee county. The charges were consolidated in Ozaukee county at Carlson's request, "pursuant to a proposed settlement," under which Carlson agreed to enter guilty pleas to two felonies, each with a maximum forty-year sentence, with "the prosecution and defense . . . free to argue the sentences."

¶ 4.   The underlying factual allegations in the complaints encompassed sexual assaults of the daughter of Carlson's girlfriend, allegedly beginning in 2000 when the victim was ten or eleven years old and continuing until 2004 when she was fifteen. The majority of the crimes occurred in Washington county, but the last assault occurred in Ozaukee county. The complaints reported that Carlson admitted some of the crimes to the victim's mother, to another relative, and to police.

¶ 5.   During the first plea hearing, confusion arose regarding the maximum sentence on the Washington county charge. The original complaint in Washington county charged a violation of Wis. Stat. § 948.025(1) (2001–02)[1] as "a Class B felony" with a sentence up to

---

[1] Neither the information nor the plea questionnaire set forth a particular year of the Wisconsin Statutes applicable to

forty years of imprisonment, but the sentence for a Class B felony was up to sixty years of imprisonment, rather than forty years of imprisonment. *See* WIS. STAT. § 939.50(3)(b) (2001–02).[2] This confusion was resolved by the second amended information, which charged the following two crimes:

> (1) a count of second-degree sexual assault of a child under the age of sixteen in Ozaukee County, in violation of WIS. STAT. § 948.02(2), a Class C felony with a forty-year maximum sentence, and

> (2) a count of repeated sexual assault of the same child in Washington County, in violation of WIS. STAT. § 948.025(1), also as a Class C felony with a forty-year maximum sentence.

¶ 6. At the final plea hearing in March 2012, Carlson's counsel explained that Carlson was "prepared to admit a factual basis" for the charges but "there may be some differences into the particulars of the facts" at sentencing. The State's allegations encompassed "a wider scope and range of activity . . . than is admitted to by Mr. Carlson," but Carlson admitted facts sufficient to

---

the charges, but the parties' discussion at the plea hearing clarified that the factual basis of the plea was being established under the law as it stood in 2003.

[2] The State explained that under the 2003 law, repeated sexual assault of the same child, WIS. STAT. § 948.025 (2001–02), could be charged as a Class B or a Class C felony, depending on whether three or more of the violations were against a child under age thirteen. The State asserted that the factual basis for the Washington county complaint supported charging the Washington county crimes as a Class B felony. However, due to the fact that "an initial error by the [S]tate" in the charging document had caused the defendant to "change[] his posture in reliance upon that [forty-year] exposure as represented" on the second charge, the State "elected to" charge the forty-year penalty.

create a factual basis for the charges: he admitted that between the spring of 2000 and May 2003 he had committed "three or more violations" by engaging in sexual contact with the same individual person under the age of sixteen.

¶ 7. Carlson's counsel interrupted the plea colloquy to emphasize that while Carlson "certainly has provided a factual basis here today . . . . [h]e will . . . state, if asked, that the scope of period of time during which there's three acts alleged is more narrow" than the period of time set forth in the complaint. Carlson was prepared to admit conduct that began "at a later point in time, when the complaining witness was older" than was alleged in the complaint.

¶ 8. The court accepted Carlson's plea and found him guilty of the charges. The parties clarified their agreement that "both sides were free to argue" as to sentencing, and the State made a record of the fact "that the [S]tate may very well be making a prison recommendation." The court ordered a presentence investigation and set a date for sentencing.

¶ 9. After reviewing the complaints and interviewing Carlson, the victim, and the victim's mother, the presentence investigator concluded that the sexual contacts had been "repeated" over a four-year period. She concluded that Carlson "admits to having some sexual contact with the victim but minimizes the extent of that contact" and that he "blames the victim for the contact" and "sees himself as the victim here." She gave specific examples of Carlson's statements during the interview minimizing his crimes and placing responsibility for his offenses on the victim. The investigator found it "disturbing" that despite his involvement in sex offender treatment, Carlson "is still not being honest about his involvement in the offenses, shows no empa-

thy for the victim, and fails to accept any responsibility for his involvement in these offenses." The investigator recommended concurrent sentences of nine to ten years of initial confinement and three or four years of extended supervision on each count.

¶ 10. Carlson submitted his own sentencing materials, including a risk assessment, a response to the presentence investigation by his sex offender treatment counselor, and a letter from Carlson himself expressing remorse and accepting more responsibility for his crimes than he had during the presentence investigation. The treatment counselor opined that while Carlson "continues to need work in the areas of taking responsibility and victim empathy," he was making progress in that regard and would continue making progress with treatment. In his own letter, Carlson stated that it had been "very difficult" to speak to the PSI agent about the offenses and that he had been "hid[ing] behind a shroud of rationalizing and justifying my actions and . . . sometimes even blaming [the victim]" until recently in his sex offender treatment. He asked the court to consider a nonprison sentence but also asked "if probation is not a consideration . . . [that the court would] choose an incarceration that" would allow him to continue working and going to counseling.

¶ 11. At the May 2012 sentencing hearing, the State stated that "[t]his case in the end is probably one of the worst cases of blame the victim or she wanted it defenses that I have ever seen." The State characterized Carlson's own account of the offenses to the presentence investigator as "simply awful" and "repugnant." In the State's view, whether Carlson had received sufficient treatment so as to be rehabilitated was the "least concern." Instead, the State argued, the primary goal of sentencing should be to hold Carlson "accountable" and

133

deter any other community members from such offenses. To that end, the State argued that the sentence recommended by the presentence investigator was insufficient and that a single fifteen-year sentence would also be insufficient.

¶ 12.   In his sentencing argument, Carlson's counsel emphasized that "[f]rom a legal standpoint" Carlson's plea was an "entire and complete acceptance of responsibility." He presented testimony by an expert that Carlson presented low risk of re-offense. He highlighted Carlson's written statement accepting full responsibility as well as the letter from Carlson's counselor explaining Carlson's progress in accepting responsibility. He acknowledged that Carlson "could have expressed himself better as it relates to the acceptance of responsibility" with the presentence investigator but argued that the lengthy prison sentences recommended by the presentence investigator and the State were not necessary to accomplish the goals of sentencing in this case. Instead, Carlson's counsel argued, "a lengthy term of jail is appropriate." Carlson himself then made an oral statement to the court accepting responsibility for his offenses and apologizing for them, and stating that he now realizes that he had "hidden behind a shroud" of rationalizing and blaming the victim.

¶ 13.   In rebuttal, the State characterized Carlson's statements as "a court steps conversion" and argued that treatment for Carlson was not an important sentencing goal. Carlson replied that he was not arguing treatment was a primary sentencing goal but instead that the law requires the court to "consider probation as a first alternative and then [determine] what level of incarceration . . . is necessary and sufficient to accomplish" sentencing goals, if probation is not appropriate.

¶ 14.   After clarifying the maximum initial confinement applicable to each charge, the court sentenced Carlson. The court considered probation, but rejected it on grounds that the conduct underlying the offenses was "truly awful." The court then considered "the least amount of incarceration [required] . . . to reach the goals of the sentence." The first factor the court discussed was the seriousness of the conduct. The court emphasized that the legislature authorized a maximum sentence of forty years for each offense and noted that Carlson's case was particularly serious because he violated his trust relationship with the child victim. The court made an effort to "correct" some of Carlson's statements to the presentence investigator, such as his attempt to distinguish between "two types of sex offenders, predators and me." "You are a predator," the court admonished, one who "groomed" the victim and "preyed on" her vulnerability.

¶ 15.   Turning to factors relating to Carlson's character, the court "applaud[ed]" Carlson for pleading guilty but calculated that, if the victim's allegations in the complaint were accepted, even in view of the defendant's contention that the conduct started later than alleged in the complaint, the abuse happened "more than 300 times" over the years. The court noted the "positives" of Carlson's work history and his support of his children but also pointed out some of Carlson's most repugnant statements to the presentence investigator, characterizing the victim's account as "embellished" and "exaggeration," as well as the efforts Carlson took to keep the offenses a family secret.

¶ 16.   Finally, the court considered the "need to protect the community," not only from Carlson as an individual but also by sending a message that "if anyone ever thinks of engaging in this conduct, that they'll be

135

dealt with harshly." The court concluded that "[t]his community deserves better than [a penalty of] probation" and work release.

¶ 17. With that explanation of the relevant factors, the court sentenced Carlson. For the repeated offenses in Washington county, the judge sentenced Carlson to fourteen years of imprisonment, bifurcated as ten years of initial confinement and four years of extended supervision. For the Ozaukee county offense, the court sentenced him to nine years of imprisonment, bifurcated as five years of initial confinement and four years of extended supervision, to be served consecutive to his sentence on the Washington county offenses.

¶ 18. Carlson filed a postconviction motion arguing that (1) he is entitled to withdraw his guilty plea based on ineffective assistance of counsel, namely his trial counsel's "incompetent advice about the likelihood of receiving a community-based sentence if he pled guilty" and "failure to calculate the potential number of sexual assaults and investigate the credibility of the allegations upon which that calculation was based";[3] (2) he is entitled to resentencing because the court relied upon inaccurate information concerning the number of assaults and because his due process rights were violated when he "had no meaningful opportunity to rebut" the alleged inaccuracy; (3) he had ineffective assistance of counsel at sentencing because trial counsel did not object to the remark about the assaults being so numerous; and (4) his sentence was "unduly harsh or unconscionable."

---

[3] Carlson also argued that his attorney's flat fee arrangement created a conflict of interest amounting to ineffective assistance of counsel, but he has abandoned that argument on appeal.

136

¶ 19.  The State responded that Carlson's motion was "factually insufficient and should be denied without a hearing." The State argued that Carlson received effective assistance of counsel, and that in the circumstances of Carlson's case, Carlson and his trial counsel had little choice as to how to proceed, since there was little prospect for a favorable outcome through trial, and going to trial would have forfeited remorse as a favorable sentencing factor. With respect to the alleged inaccuracy in the number of assaults, the State noted that the record reflects the court's acceptance of Carlson's qualifications during his plea and that any misstatement of the actual number of assaults was "not material and could well be interpreted as hyperbole." The State finally argued that the sentence could not be unduly harsh or unconscionable when it is so far within the limits of the maximum sentence and would not "shock the public sentiment."

¶ 20.  After hearing arguments from both sides, the court denied Carlson's postconviction motion without an evidentiary hearing. To begin with, the court concluded that there was no deficient performance justifying plea withdrawal. Carlson made clear during the plea hearing that he was not admitting the full extent of the allegations in the complaints. Carlson expressed that he wanted to accept responsibility and avoid trial. As for whether a nonprison sentence was a realistic possibility, the sentencing data Carlson filed with his postconviction motion confirmed that defendants facing each of the charges Carlson faced had received nonprison sentences. The decision to plead guilty was, the court noted, "strong ammunition" at sentencing. During the plea colloquy, Carlson had "ample opportunity" to decline to enter his plea and instead chose to admit his guilt and give the basis for

137

his plea. In short, nothing in the moving papers, if proven, was grounds for plea withdrawal.

¶ 21. As for the impact of the alleged inaccurate information at sentencing about the number of assaults, the court stated that its remark about the number of assaults should not be taken "out of context." The remark was made as the court described the effect of the numerous assaults on the victim, but the court thereafter had explained that what made the offenses so serious was the "repulsive" nature of the offenses, Carlson's relationship with the victim, and the long-lasting effect of the offenses on the victim. Carlson "was not being sentenced for" the large number of assaults. Finally, the court rejected the argument that the sentence was harsh or unconscionable, since it is a fraction of the maximum penalty for Carlson's offenses.

¶ 22. Carlson appeals.

## *Discussion*

¶ 23. Carlson primarily argues that he should be permitted to withdraw his plea because of the ineffective assistance of counsel. He also argues that his sentence was based on inaccurate information and was unduly harsh. We discuss each argument in turn.

### *No Manifest Injustice Justifies Plea Withdrawal*

¶ 24. A defendant who seeks to withdraw his plea after sentencing must show by clear and convincing evidence that "manifest injustice" requires withdrawal. *State v. Taylor*, 2013 WI 34, ¶ 24, 347 Wis. 2d 30, 829 N.W.2d 482. Manifest injustice may exist if the trial court failed to properly perform its duties during plea

138

colloquy or if something extrinsic to the plea colloquy undermined the knowing, intelligent, and voluntary nature of the plea. *State v. Howell*, 2007 WI 75, ¶¶ 27, 74, 301 Wis. 2d 350, 734 N.W.2d 48.

¶ 25.   Carlson asserts no errors in the plea colloquy here. Instead, he argues that a factor extrinsic to the colloquy—namely, his counsel's advice that if he pled guilty, he had a "realistic" possibility of a nonprison sentence—undermined the plea. A defendant who asserts that something extrinsic to the plea colloquy undermined the knowing, intelligent, and voluntary nature of his plea must allege facts that, if true, entitle him to relief. *Id.*, ¶ 75. Conclusory allegations do not suffice. *Id.* If the record demonstrates that the defendant is not entitled to relief, the trial court has discretion to deny the motion without any evidentiary hearing. *Id.* On appeal, we review independently whether the defendant alleged facts entitling him to relief. *Id.*, ¶ 78. If the motion did not entitle the defendant to relief, then we review the court's decision whether to grant an evidentiary hearing under the erroneous exercise of discretion standard. *Id.*, ¶ 79.

¶ 26.   To prove that ineffective assistance of counsel undermined his plea, Carlson must show both that his trial counsel's performance was deficient and that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both elements must be proven, so failure to show either deficiency or prejudice dooms the defendant's ineffective assistance argument. *State v. Swinson*, 2003 WI App 45, ¶ 58, 261 Wis. 2d 633, 660 N.W.2d 12.

¶ 27. In considering whether counsel's performance was deficient, we recognize a strong presumption that counsel acted reasonably within professional norms. *Id.*, ¶ 58. Counsel is deficient if performance errors are so serious that the defendant's situation was the functional equivalent of proceeding without counsel. *Id.* The issue is whether counsel's performance was "objectively reasonable." *State v. Carter*, 2010 WI 40, ¶ 24, 324 Wis. 2d 640, 782 N.W.2d 695.

¶ 28. Carlson can establish no deficiency in his counsel's performance at the time of his plea under the rubric of a "realistic possibility of probation." None of the three facts that Carlson relies upon demonstrates deficient performance. Those three facts are: (1) the prosecution's rejection of a nonprison sentence during plea negotiations, (2) the fact that the charges were very serious and alleged such numerous assaults, and (3) the fact that sentencing data indicates that similarly situated offenders rarely receive nonprison sentences.

¶ 29. As for the first factor, the prosecution's opposition to a nonprison sentence, the prosecution's position does not determine whether a particular sentence is a realistic possibility. The trial court is not bound to accept the prosecutor's position. *State v. Hampton*, 2004 WI 107, ¶ 37, 274 Wis. 2d 379, 683 N.W.2d 14. Under the circumstances of Carlson's case, accepting responsibility was one of the only strategies left, if Carlson wished to avoid prison. In the words of the court at Carlson's postconviction motion hearing, pleading guilty was "strong ammunition" in his favor at sentencing.

¶ 30. The second factor also fails to establish deficient performance. Carlson alleges that his trial counsel did not realize until sentencing that, based on the victim's statements, the total number of assaults could be calculated as high as three hundred, and that trial counsel would not have advised Carlson to plead guilty if he had realized that the number of alleged assaults was so high. Because the trial court failed to hold an evidentiary hearing, we must accept these allegations as true, even if we doubt that Carlson's characterization of his trial counsel's performance would hold up to scrutiny at an evidentiary hearing. Even if these allegations are true, however, the test for whether counsel's performance was deficient is objective, *Carter*, 324 Wis. 2d 640, ¶ 24, not subjective. So, it is not enough to allege that Carlson's trial counsel would have advised him not to plead guilty if he had read the complaints to allege more than three hundred assaults. The question is whether it was objectively reasonable to advise Carlson that a guilty plea offered a realistic possibility of a nonprison sentence.

¶ 31. In view of the evidence against Carlson, the advice was objectively reasonable. As a first-time offender, Carlson was eligible for a nonprison sentence, but the nature of the allegations and Carlson's confessions foreclosed most favorable sentencing arguments. Among the strongest and best "ammunition" left to Carlson was a guilty plea, which could eliminate the additional trauma of trial and demonstrate his remorse. His counsel's alleged failure to recognize that the number of assaults would be higher than heretofore recognized was immaterial in this context. A guilty plea was an objectively reasonable strategy for obtaining a nonprison sentence. Besides, how was Carlson's counsel

141

supposed to know that the court would sua sponte add up the number of assaults at the hearing so as to prepare a response?

¶ 32.   The third and final factor is objective sentencing data. Carlson asserts that objective sentencing data should have put his trial counsel on notice that a nonprison sentence was not a realistic possibility. Carlson's reliance on this data, however, is puzzling, since it shows significant numbers of defendants who obtained nonprison sentences for each of the crimes with which Carlson was charged. Carlson emphasizes that no defendant who pled guilty to the combination of both of these charges received a nonprison sentence, but there were only five such defendants in the entire data set, which cannot show that a nonprison sentence was never a realistic possibility for Carlson.

¶ 33.   In addition, although a defense attorney is free to consider sources of objective sentencing data, failing to do so is not ineffective assistance. Sentencing in Wisconsin is individualized. *State v. Gallion*, 2004 WI 42, ¶ 48, 270 Wis. 2d 535, 678 N.W.2d 197. The sentencing commission and sentencing guidelines have been abolished. *State v. Barfell*, 2010 WI App 61, ¶ 4, 324 Wis. 2d 374, 782 N.W.2d 437. The court will not consider that data at sentencing. So its relevance is limited. The reality is that whatever the objective sentencing data shows about overall sentencing, a defendant's chances of a particular sentence are individual. A defendant's situation in trying to predict the sentence he or she will receive is similar to the situation of a person diagnosed with a serious illness. Data may show that only 25% of people survive the disease, but for any particular individual, the chances of survival are black or white, zero or 100%. Likewise, few individuals con-

victed of both charges Carlson was facing may obtain nonprison sentences, but for any particular individual, the chances were zero or 100%. And in Carlson's individual situation, if a nonprison sentence was his hope, pleading guilty was a sound strategy—perhaps the *only* realistic strategy—for achieving that outcome.

¶ 34.   In summary, even if we accept as true all of Carlson's allegations about his trial counsel's performance, none of those allegations amounts to deficient performance at the plea stage.

¶ 35.   We pause at this point to suggest to trial courts that, when allegations of ineffective counsel are made and the allegations include claims about what counsel said to the defendant, the better practice is to hold an evidentiary hearing to find the historical facts of what was said. If the court decides not to hold an evidentiary hearing, then the allegations must be assumed to be true. We can only picture the angst of dedicated criminal defense lawyers when words they did not say are ascribed to them by default. More importantly, there may come a case where the failure to hold a hearing compromises the trial court's decision on the matter. By making a record, our court can operate under full knowledge of the facts rather than a supposition of what was claimed to be said. In this case, we had to assume that counsel actually used the term "realistic possibility." But assuming the truth of that statement, it did not amount to ineffective assistance for the reasons stated.

### Any Inaccurate Information at Sentencing Was Harmless

¶ 36.   We have already discussed Carlson's arguments that his counsel should have calculated the high

number of assaults described in the complaints before advising Carlson to plead guilty. When we turn to Carlson's sentencing arguments, we must again address the facts about the number of assaults because Carlson's sentencing arguments focus on the court's calculation of the number of assaults during the sentencing hearing. Carlson argues that the calculation was inaccurate information that the court relied upon at sentencing. Carlson also claims that his trial counsel's failure to object to and refute the calculation was ineffective assistance of counsel.

¶ 37.   We review sentencing decisions for an erroneous exercise of discretion. *Gallion*, 270 Wis. 2d 535, ¶ 18. A defendant has a due process right to be sentenced upon accurate information. *State v. Travis*, 2013 WI 38, ¶ 17, 347 Wis. 2d 142, 832 N.W.2d 491. A defendant who seeks resentencing based on inaccurate information at the sentencing hearing must prove both that the information was inaccurate and that the trial court relied on it. *State v. Tiepelman*, 2006 WI 66, ¶ 26, 291 Wis. 2d 179, 717 N.W.2d 1.

¶ 38.   The State concedes on appeal that the trial court actually relied on this calculation at sentencing. We agree with the State, however, that the information was accurate, and that any inaccuracy was harmless. Carlson does not dispute the court's calculation from the factual allegations in the complaint, but instead alleges that he could present evidence to show that the victim's mother was present in the home, and that Carlson and the victim each were away from the home, during relevant periods of time. Such evidence, however, would not conflict with the allegations in the complaint that formed the basis of the court's calcula-

tion, since the assaults are described as having occurred out of sight of other household members on an opportunistic basis. When the victim reported that the assaults happened twice weekly over a finite period of time, the math is easy and is based on the record before the court. More importantly, even if the "300 to 400" number the court mentioned was to some degree inflated, there is no reasonable probability that such inaccuracy contributed to Carlson's sentence. It was a single, hyperbolic remark during the course of a long sentencing explanation. As we have already explained, the factors that formed the basis for the court's sentence were Carlson's exploitation of his position of trust, his victim-blaming, and the need to deter others from such offenses, not the number of assaults.

¶ 39. For the same reason, it was no error for Carlson's trial counsel not to object to the "more than 300 assaults" remark. The challenge for Carlson's trial counsel at sentencing was that Carlson's repugnant statements and attitude during the presentence investigation, along with his minimizing of his crimes and blaming the victim, greatly undermined the favorable impact of his guilty plea. In this context it was an objectively reasonable decision to forego quibbling about whether the assaults numbered in the single, double, or triple digits, just before the court pronounced sentence.

¶ 40. In summary, the alleged inaccurate information about the number of assaults at sentencing was harmless, and trial counsel's decision not to object to it was reasonable.

*Carlson's Sentence Was Not Harsh*

■■ ■■

¶ 41. The trial court has discretion to determine a sentence within the range allotted by the legislature.

*Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975). We review that exercise of discretion for whether the sentence "is so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper." *Id.*

¶ 42.    Carlson points to various positive factors, such as his guilty plea, his lack of a criminal record, his low risk of re-offense, etc., as proof that his sentence was unduly harsh, but the weighing of sentencing factors is an exercise of the trial court's sound discretion. *See Gallion*, 270 Wis. 2d 535, ¶ 17. In his guilty plea and the presentence investigation, Carlson admitted assaulting the victim, his girlfriend's daughter, five or six times over the course of three or four years. Those admissions triggered a maximum sentence of eighty years of imprisonment, fifty years of which could have been imposed as initial confinement. His ultimate sentence amounted to less than one-third of the maximum, and only fifteen years of initial confinement. The court offered a "rational and explainable basis" for the sentence. *See id.*, ¶ 76. The explanation was adequate and reasonable, and the sentence was by no means harsh or unusual in light of Carlson's offenses. We affirm in the entirety.

*By the Court.*—Judgment and order affirmed.